NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

ALPHEUS ELITE HAMILTON, *Appellant.*

No. 1 CA-CR 16-0166
FILED 8-24-2017

Appeal from the Superior Court in Maricopa County
No. CR2014-132517-001
The Honorable Colleen L. French, Judge, *Pro Tempore*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Robert A. Walsh
*Counsel for Appellee*

Ballecer & Segal, LLP, Phoenix
By Natalee E. Segal
*Counsel for Appellant*

**MEMORANDUM DECISION**

Presiding Judge Diane M. Johnsen delivered the decision of the Court, in which Judge Kent E. Cattani and Judge Peter B. Swann joined.

**J O H N S E N**, Judge:

**¶1**         Alpheus Elite Hamilton appeals his convictions of two counts of molestation of a child, each a Class 2 felony and dangerous crime against children; one count of sexual conduct with a minor under 15, a Class 2 felony and dangerous crime against children; and four counts of sexual conduct with a minor under 18, each a Class 6 felony.  For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

**¶2**         Hamilton was the victim's mother's boyfriend.[1]  He moved in with the victim's family when the victim was 11 years old.  Hamilton stayed home with the victim and her brother while their mother worked and was the disciplinarian of the family.  Hamilton began molesting the victim when she was 12 years old and began to have sexual intercourse with her when she was 14.

**¶3**         At trial, the State presented testimony from Dr. Christina Schopen, an expert on the behavioral characteristics of children who have experienced sexual abuse. Schopen was a so-called "blind" expert—she had not interviewed the victim.  Hamilton's theory of defense was that the victim falsely accused him in retaliation because he was "disciplining her, . . . not allowing her to run free . . . [and] be alone with her boyfriend," and "put[ting] those rules down hard."

**¶4**         After the jury convicted Hamilton, the superior court imposed concurrent sentences of 17 years' imprisonment for the two counts of child molestation and a consecutive term of 20 years' imprisonment for sexual conduct with a minor.  The court also imposed lifetime probation for the remaining four counts of sexual conduct with a minor under 18. Hamilton filed a timely notice of appeal.  We have jurisdiction pursuant to

---

[1]     We view the evidence in the light most favorable to sustaining the convictions.  *State v. Boozer*, 221 Ariz. 601, 601, ¶ 2 (App. 2009).

Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) (2017), 13-4031 (2017), and -4033(A) (2017).[2]

## DISCUSSION

### A.    Expert Testimony.

¶5          Hamilton argues the superior court erred by allowing Schopen to testify that although there is a percentage of child victims who fabricate allegations of sexual abuse, the research does not show a high probability of fabrication associated with accusations against parental figures who are strict disciplinarians.  He contends the court thereby allowed Schopen to testify improperly about the victim's truthfulness. Hamilton did not object to Schopen's testimony at trial; accordingly, he has waived all but fundamental error review.  *See State v. Henderson*, 210 Ariz. 561, 568, ¶ 22 (2005).  On fundamental error review, the defendant has the burden of proving that the court erred, that the error was fundamental in nature, and that he was prejudiced thereby.  *Id.* at 567, ¶ 20.

¶6          A witness may not offer an opinion about the truthfulness of another witness's statement.  *State v. Boggs*, 218 Ariz. 325, 335, ¶ 39 (2008) (citations omitted).  Determinations of veracity and credibility are fully within the province of the jury, and expert opinion testimony about witness credibility is "nothing more than advice to jurors on how to decide the case." *State v. Moran*, 151 Ariz. 378, 383 (1986).  Accordingly, it is improper, for example, to allow an expert to "quantify the percentage of victims who are truthful in their initial reports despite subsequent recantation."  *Id.* at 382 (citations omitted).

¶7          On cross-examination, Hamilton questioned Schopen on the frequency of false allegations made by child complainants:

> Q. Is there a group of I guess you call them children who had a higher tendency to make false disclosures?
>
> A. What the research bills out is that children involved in divorce and custody disputes, and teenagers who have an ulterior motive, like let's say that dad is out of the home and step dad came in, and they wanted dad back but step dad out, or that they got in trouble.  Maybe they were having sexual

---

[2]      Absent material revision after the date of an alleged offense, we cite a statute's current version.

relations with someone else, and they're trying to put that off on someone, and trying to say someone else did that to them.

Q. And you said that was mostly teenagers?

A. Yes, in the research. The divorce and custody are like your younger kids, your preschoolers.

Q. Okay. And your teenager, are we talking about females or males or both?

A. Oh, I believe it was on females.

*   *   *

Q. And the research shows that teenage females have more of a tendency to, I guess, make those false disclosures?

A. What the research says is: If there is a false allegation, that the—where they saw the pattern was in adolescents, and your preschoolers in the custody and divorce cases.

Q. Okay. And with regard to I think you said divorce or separated, have you seen cases where the teenager may be mad at one of the parents for being a stern disciplinarian, and would make up that story against that stern disciplinarian?

A. I think the research—I don't remember them specifically pointing out that case. Understand that as a forensic interviewer, my job would not be to deem voracity [sic] to determine whether or not that child is telling the truth in the forensic interview. My job is to provide, as a forensic interviewer, the best opportunity for the child to give as much detail as possible so that you make that determination.

And so if we're talking about forensic interviewer experience, then I'm going to say I'm not able to answer that.

On redirect, the State attempted to clarify Schopen's testimony regarding false allegations of sexual abuse:

Q. All right. Now, within terms of these false allegations that Mr. Carr asked you about, are there actually studies that . . . give you statistics about what percentage of allegations are actually false allegations?

4

Just yes or no, are there studies?

A. Yes.

Q. Okay. Are you allowed to talk about the statistics when you're on the witness stand?

A. We don't give percentages.

Q. Okay. So if [I] were to ask you about those, that would not be a question you would be able to answer?

A. No.

Q. And still stay within case law and professional ethic rules[,] right?

A. Correct.

Q. So just, in general, when we're talking about false allegations, you said it broke down into two categories.

The first category was younger children in a custody situation?

A. Right.

Q. Okay. And what was the second category again?

A. Like your teenagers who had an ulterior motive like getting dad out of the home, because now step dad is there and they don't like step dad, or they were having sexual relations with a boyfriend, and they don't want that boyfriend to get in trouble so they blame someone else.

Q. Okay. And have you seen in the research—Mr. Carr asked you a question about a situation where there is [sic] false allegations because the child wants to retaliate against a disciplinarian.

Do you recall anything in the research that supports that situation?

A. I don't recall seeing that.

¶8        Hamilton takes issue with Schopen's testimony that, although research has documented some unspecified percentage of false allegations of sexual abuse made by teens who are motivated by dislike of a step-parent or who are engaging in sexual relations with boyfriends, she had not seen research showing that teens likewise make false accusations as retaliation against a parent figure who is a strict disciplinarian.

¶9        None of Schopen's testimony, however, was improper.  She testified only that she was not aware of or did not recall seeing research that defense counsel asked her about, and she did not testify regarding the veracity of the particular victim in this case.  In fact, she made clear that she had no information about the particular facts of this case and had not met the victim.  Additionally, Schopen acknowledged that children lie about sexual abuse—sometimes for ulterior motives—which supported Hamilton's defense.  Thus, viewed in its entirety, Schopen's testimony did not tell the jury "who is correct or incorrect, who is lying and who is truthful."  *State v. Lindsey*, 149 Ariz. 472, 474 (1986).  Accordingly, the superior court did not err, let alone commit fundamental error, by failing *sua sponte* to preclude Schopen's testimony.[3]

## B.        Asserted Prosecutorial Vouching.

¶10        Hamilton also argues the prosecutor improperly vouched for the victim's credibility.  Prosecutorial vouching takes two forms: "(1) where the prosecutor places the prestige of the government behind its witness; (2) where the prosecutor suggests that information not presented to the jury supports the witness's testimony." *State v. Vincent*, 159 Ariz. 418, 423 (1989) (citations omitted).  Because Hamilton did not object to the statements at trial, we review her argument for fundamental error. *Henderson*, 210 Ariz. at 568, ¶ 22.

¶11        Hamilton first argues the prosecutor vouched for the victim's credibility by eliciting Schopen's testimony as recounted above.  Hamilton cites no authority for the proposition that a prosecutor may vouch by way of his or her examination of an expert witness.  In any event, as discussed

_____

[3]        Although we do not hold that Hamilton invited error, the State's redirect examination of Schopen concerning the existence of research showing false accusations made by teens against strict disciplinarians was little different from Hamilton's query of Schopen on cross-examination as to whether she had "seen cases where the teenager may be mad at one of the parents for being a stern disciplinarian, and would make up that story against that stern disciplinarian?"

above, Schopen simply stated she was unaware of studies showing that children are likely to make false allegations against strict disciplinarians, testimony she gave in cross-examination and repeated on rebuttal.

¶12        Second, Hamilton argues that during closing argument, the prosecutor offered an improper personal opinion on the credibility of the victim by making the following statement:

> And I think when you put everything that [the victim] did and all of her testimony and all of the evidence and certainly the ridiculous assertions that the defendant made regarding the confrontation call, when you put all of that together, there is really only one conclusion that a rational person with a rational person filter can make.

> And that conclusion is that this guy, right over here, Mr. Football Coach, Mr. Mom, best dad in the world, he molested that kid.  Not once, not twice, but for five years.  Five years. And he wants you to believe that she's a liar.

> **But when you look at everything, you know the truth.**

> **There is a liar, but it's not [the victim].**

(Emphasis added.)

¶13        "Unlike opening statements, during closing arguments counsel may summarize the evidence, make submittals to the jury, urge the jury to draw reasonable inferences from the evidence, and suggest ultimate conclusions." *State v. Bible*, 175 Ariz. 549, 602 (1993) (citations omitted). Given the evidence presented at trial, it was not improper for the prosecutor to suggest that the evidence did not support Hamilton's version of events. And the prosecutor's argument that the *jury* should find Hamilton lacking in credibility did not amount to an expression of the prosecutor's personal opinion concerning his credibility. Under the circumstances, the prosecutor permissibly urged the jury to draw a reasonable inference from the evidence presented.

**CONCLUSION**

**¶14**        For the foregoing reasons, we affirm Hamilton's convictions and resulting sentences.



AMY M. WOOD • Clerk of the Court
FILED:  AA